# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2016-KA-01376-COA

**JONATHAN EARL HERRINGTON A/K/A**          **APPELLANT**
**JONATHAN HERRINGTON**

**v.**

**STATE OF MISSISSIPPI**          **APPELLEE**

DATE OF JUDGMENT:    08/08/2016
TRIAL JUDGE:    HON. VERNON R. COTTEN
COURT FROM WHICH APPEALED:    NESHOBA COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:    OFFICE OF STATE PUBLIC DEFENDER
   BY: GEORGE T. HOLMES
ATTORNEY FOR APPELLEE:    OFFICE OF THE ATTORNEY GENERAL
   BY: ABBIE EASON KOONCE
DISTRICT ATTORNEY:    MARK SHELDON DUNCAN
NATURE OF THE CASE:    CRIMINAL - FELONY
DISPOSITION:    AFFIRMED - 10/10/2017
MOTION FOR REHEARING FILED:
MANDATE ISSUED:

**BEFORE GRIFFIS, P.J., CARLTON AND GREENLEE, JJ.**

**CARLTON, J., FOR THE COURT:**

¶1. A Neshoba County grand jury indicted Jonathan Herrington for the deliberate-design murder of Billy Scott Bishop. *See* Miss. Code Ann. § 97-3-19(1)(a) (Rev. 2014). Following Herrington's trial, a jury convicted him of manslaughter. *See* Miss. Code Ann. § 97-3-35 (Rev. 2014). The Neshoba County Circuit Court then sentenced Herrington to twenty years in the custody of the Mississippi Department of Corrections (MDOC). *See* Miss. Code Ann. § 97-3-25(1) (Rev. 2014).

¶2. On appeal from his conviction and sentence, Herrington raises the following issues:

(1) whether the circuit court erred by admitting improper opinion testimony; (2) whether the circuit court erred by admitting Kimberly Gentry's four written pretrial statements; (3) whether insufficient evidence supported the verdict; (4) whether the verdict was against the overwhelming weight of the evidence; and (5) whether resentencing or sentence clarification is needed.[1]

¶3.    Finding no error, we affirm Herrington's conviction and sentence.

## FACTS

¶4.    Around 4 a.m. on October 16, 2014, Deputy Jessie Hamilton with the Neshoba County Sheriff's Department responded to a call about a disturbance and a shooting that had occurred at Herrington's residence almost two hours earlier around 2 a.m. Upon arriving at Herrington's mobile home, Deputy Hamilton encountered Herrington, who was sitting on his back porch and bleeding from a cut under his eye. At trial, Deputy Hamilton testified as to what Herrington said occurred prior to, during, and after Bishop's shooting.

---

[1] Herrington's judgment of conviction was signed on August 8, 2016, and filed on August 15, 2016. Under Rule 4(a) of the Mississippi Rules of Appellate Procedure, Herrington had thirty days to timely file his notice of appeal. The record shows that Herrington submitted his motion for appeal to the circuit court prior to the thirty-day deadline. Also prior to the expiration of the thirty-day deadline, the circuit court heard Herrington's motion and signed an order granting his appeal and his request for in forma pauperis status. However, Herrington's appeal was not filed with the circuit court clerk until after the expiration of the thirty-day deadline. Even so, we may suspend Rules 2 and 4 of the Mississippi Rules of Appellate Procedure to allow an out-of-time appeal in a criminal case. *See Wells v. State*, 73 So. 3d 1203, 1207 (¶8) (Miss. Ct. App. 2011). As reflected by its grant of Herrington's appeal and request for in forma pauperis status, the circuit court found Herrington's appeal to be timely. Thus, in the interests of justice, we allow his appeal to proceed, and we address the merits of his assignments of error. *See id.*

¶5.     According to Deputy Hamilton's testimony, Herrington stated he was lying in his bed when Bishop walked into his bedroom and attacked him. Herrington claimed that Bishop entered his bedroom holding a cell phone and told Herrington the caller wanted to speak to him. After taking the phone, Herrington reported that Bishop jumped on top of him and began hitting him. Herrington said he tried to push Bishop away and then noticed Bishop reaching for a pistol. Herrington told Deputy Hamilton that he then reached for his own pistol, which he kept under his pillow. Herrington stated that he fired at Bishop twice and that Bishop fell over but kept trying to come toward him. As a result, Herrington said he shot Bishop a third time. Herrington further told Deputy Hamilton that he placed all the guns involved in the incident on the kitchen table.

¶6.     Upon entering Herrington's residence, Deputy Hamilton saw Gentry sitting in the living room. As Herrington had stated, Deputy Hamilton found three guns on the kitchen table: Herrington's .38 revolver, Gentry's .380 pistol, and the .357 revolver that Herrington claimed was in Bishop's possession. Consistent with what Herrington had told him, Deputy Hamilton removed three spent rounds from Herrington's .38 revolver. Deputy Hamilton removed one spent round from the .357 revolver, and he unloaded the magazine and one bullet from the chamber of Gentry's .380 pistol.

¶7.     When he entered Herrington's bedroom, Deputy Hamilton observed Bishop lying on his back halfway across the bottom corner of the bed. Deputy Hamilton also noted blood stains in the center of the mattress. Deputy Hamilton testified that "[m]ost of the blood that

3

was on . . . Bishop was in the facial area[, a]nd the spot in the middle of the bed was coagulated blood." After overruling the defense's objection, the circuit court allowed Deputy Hamilton to testify that, based on his observations, he believed Bishop had lain face down in the center of the mattress at one point but that his body had later been rolled over and moved to the edge of the bed.

¶8.     As further trial testimony reflected, Herrington had met both Bishop and Gentry only recently before the shooting. Gentry testified that Herrington and Bishop had just started hanging out the week before the shooting and that the two appeared to get along with each other. Although Herrington's house was about fifteen minutes from hers, Gentry stated that both Herrington and Bishop had been staying with her for almost a week while they all used crystal methamphetamine and marijuana. Gentry's then-boyfriend, Jamey Johnson, testified that he had also been hanging out and using drugs with the group during this time period. Johnson corroborated Gentry's testimony that Herrington and Bishop appeared to get along well with each other.

¶9.     Gentry further testified at trial that Herrington left her house the morning of the shooting and returned to his own home. Gentry stated that Bishop grew angry when he learned Herrington had left. According to Gentry, Herrington took a stolen gun, a .357 revolver, with him when he left her house, and Bishop was upset because the two men "were supposed to split whatever came out of [the sale of the gun.]" Gentry also testified that she received a strange phone call the day of the shooting from an unknown caller. The caller

allegedly threatened "to blow [Gentry's] brains out" if Gentry did not stop mentioning Herrington's name and hanging out with him. Gentry testified that Bishop called the person back and warned him or her against threatening Gentry.

¶10.    Gentry also testified that, later the same day, she made plans with Herrington to go to his house. Johnson picked up Gentry and Bishop, and the three drove to Herrington's residence. Both Gentry and Johnson testified that Herrington knew they were headed to his house. When they arrived at Herrington's residence, Herrington was already there with Billy Withers and Josh Henley. Although neither Gentry nor Johnson were acquainted with Withers, they knew Henley. Gentry and Johnson testified that they and Bishop gave Henley a ride elsewhere and then returned to Herrington's residence. Upon returning to Herrington's residence, Gentry testified that she, Johnson, and Bishop joined Herrington in his bedroom.

¶11.    According to Gentry, she received a call from the same number as earlier in the day when the caller had threatened her. Gentry said that this time the caller asked for Bishop. Gentry stated that she handed the phone to Bishop, who then tried to give the phone to Herrington. Although Gentry testified that Herrington refused to take the phone, Johnson testified that Herrington took the phone and put it on speaker phone. However, both Gentry and Johnson agreed that a fight ensued between Herrington and Bishop. Gentry and Johnson testified that Bishop jumped on top of Herrington, who was sitting on his bed. According to Gentry's and Johnson's testimony, Bishop then began to hit Herrington.

¶12.    Gentry stated that she wanted to stop the fight. She testified that she went into the

5

kitchen, grabbed her .380 pistol from her purse, and fired a single shot in the air away from Herrington's bedroom. Upon hearing the shot, Johnson ran from the bedroom to check on Gentry. Johnson corroborated that he heard Gentry fire only one shot. After seeing that Gentry was unharmed, Johnson immediately returned to the bedroom, where he saw Bishop "jumping over the bed" toward Herrington. Johnson testified that Herrington was now sitting on the floor and that Bishop was "[a]lmost touching" Herrington when Herrington fired two shots toward Bishop's head. Gentry, who was still in the kitchen, testified that she also heard two shots but that she did not witness the actual shooting. After the shooting, Johnson stated that Bishop lay face down in the middle of Herrington's bed. Johnson testified that he grabbed Gentry, and the two drove away in his vehicle.

¶13. While Johnson and Gentry were driving, Herrington called Gentry. Gentry agreed to meet Herrington at his mother's house. After Johnson dropped her off, Gentry returned with Herrington to his residence. Gentry testified that Johnson and Herrington were both members of the Simon City Royals gang. On the drive back to Herrington's residence, Gentry testified that Herrington said he had "earned his teardrop," which meant he had killed someone. Gentry further claimed that Herrington told her "[h]e did what he had to do."

¶14. Gentry testified that she saw no gun in Bishop's possession the day of the shooting, and she stated that she saw neither Bishop nor Herrington in possession of a weapon just before the shooting. Johnson also saw no gun in Bishop's possession and testified that the only weapons he saw were those fired by Gentry and Herrington. Although Gentry testified

6

that she, Bishop, and Herrington were not doing drugs the night of the shooting, she stated that, at the time of the shooting, they were all still under the influence of the drugs they had taken the previous day.

¶15.    According to Gentry, about three hours elapsed between the shooting and when she and Herrington arrived back at his residence from his mother's house.  Gentry said that Herrington began gathering up items as soon as they entered his home.  Gentry stated that Herrington went into his bedroom, took a picture of Bishop's body, and sent the picture to someone.  Gentry further said she overheard a phone conversation Herrington had in which he stated, "[N]o, we'd have to burn my whole trailer down[] if we did that."  Based on the context of the conversation, Gentry assumed Herrington and the person on the other end of the call were talking about trying to get rid of Bishop's body.  Gentry further testified that, upon returning to Herrington's residence, she laid her .380 pistol on the kitchen table and that Herrington laid his .38 revolver and a .357 revolver on the table.  Gentry stated that Herrington retrieved a fourth gun, the stolen .357 revolver, and then left the house to dispose of the weapon.  According to Gentry, Herrington gave her a phone to call 911 and instructed her as to what to tell the operator.

¶16.    During Gentry's cross-examination, Herrington's attorney questioned her about four written pretrial statements she gave to law enforcement.  Gentry gave two statements the day of the shooting on October 16, one statement the day after the shooting on October 17, and one statement several days later on October 28.  The defense cross-examined Gentry about

7

portions of each individual pretrial statement and about any perceived differences between her pretrial statements and her trial testimony. On redirect, the State moved to admit Gentry's pretrial statements into evidence. Over the defense's objection, the circuit court admitted all four statements. When asked on redirect about the number of pretrial statements she gave, Gentry explained that she was in custody following the shooting and was therefore no longer taking drugs. Gentry testified that the law-enforcement officers "knew [her] clarity would become better after . . . [she] had more time to calm down from the event." Gentry further testified that her memory was still impaired from her drug use when she gave her statements on October 16 and 17. However, she stated that she was no longer impaired when she gave her final statement on October 28.

¶17. The jury also heard testimony from Investigator Kevin Baysinger with the Neshoba County Sheriff's Department. Investigator Baysinger stated that he responded to a call on October 16 about someone being shot after breaking into a house. After arriving at Herrington's residence, Investigator Baysinger photographed the scene and collected evidence. Investigator Baysinger testified that he recovered a spent shell casing from Gentry's .380 pistol by the kitchen garbage can. Consistent with Deputy Hamilton's testimony, Investigator Baysinger noted that Herrington's .38 revolver had three spent shell casings. Investigator Baysinger found one spent projectile from Herrington's .38 revolver on the bedroom floor close to Bishop's body. As later testimony revealed, two more spent projectiles from Herrington's .38 revolver were recovered from Bishop's body during the

8

autopsy. In addition to the shell casings and projectiles, Investigator Baysinger collected a hat with a hole in the back of it from near the foot of the bed.

¶18. Investigator Baysinger testified that after waiving his rights, Herrington gave a written statement to law enforcement on October 20. In his statement, Herrington said that he was lying in his bed when Bishop attacked him without warning. Herrington wrote that Bishop "handed me the phone with some unknown person yelling[,]" and then Bishop "began to hit me in my face constantly[.]" Herrington's statement said he felt he had no choice other than to defend himself against Bishop's attack. According to the statement, Bishop was on top of Herrington when Herrington saw Bishop reach for a .357 revolver. Herrington wrote that he pulled his own gun, a .38 revolver, from beneath his pillow and "fired twice directly toward[] [Bishop's] facial area." Herrington further stated that Bishop was still on his legs and moving when he "fired the third and final shot to the direct center of the back of [Bishop's] head."

¶19. Although both Herrington and Gentry admitted handling the guns found on the kitchen table, and although Herrington told law enforcement that Bishop had the .357 revolver in his possession, Investigator Baysinger testified that no prints were recovered from any of the weapons. Investigator Baysinger further testified that, in his experience, this was odd for a crime scene. In addition, Investigator Baysinger stated that, other than Herrington's pretrial statement, no evidence linked the .357 revolver to Bishop or indicated that Bishop had ever had the weapon in his possession.

9

¶20.    During his testimony, Investigator Baysinger confirmed that law enforcement recovered a fourth gun, another .357 revolver, from the home of Herrington's mother and stepfather.  Investigator Baysinger testified that Gentry told law enforcement the gun belonged to her father and had been stolen from her residence.  Investigator Baysinger also testified that the list of items removed from Bishop's body and returned to his family included a black-handled knife with a sheath and two pocket knives.

¶21.    Dr. John Davis, who performed Bishop's autopsy, testified that he observed two shots to the back of Bishop's head and one shot to his chest.  Dr. Davis stated that the shot fired at Bishop's torso traveled from front to back at a downward angle.  Dr. Davis recovered the bullet that caused the torso wound.  As for the two shots to the back of Bishop's head, Dr. Davis testified they were so close in proximity they entered Bishop's skull through one common defect and then traveled on inseparable wound paths.  Although he recovered one of the bullets fired at the back of Bishop's head, Dr. Davis stated that the second bullet exited Bishop's body.  Dr. Davis further said that any of the three shots, taken individually, would have been fatal to Bishop.  Depending on Bishop's overall health and fitness, however, Dr. Davis testified that it could have taken several seconds to a few minutes for Bishop to succumb to his injuries.  Dr. Davis also stated that Bishop was alive when all three shots were fired, and he opined that all three shots were fired close together in a relatively short amount of time.

¶22.    According to the forensics expert who conducted a ballistics test on the two bullets

recovered from Bishop's body, both were fired from Herrington's .38 revolver. The jury also heard testimony that an alcohol and drug screen revealed the presence of methamphetamine, amphetamine, diazepam, and nordiazepam in Bishop's blood. Although Bishop was under the influence of these drugs at the time he died, the expert who conducted the analysis could not say to what extent the drugs affected Bishop.

¶23. During the defense's case-in-chief, Withers, who was also present at Herrington's residence at the time of the shooting, testified on Herrington's behalf. Withers stated that he, Henley, and Herrington were at Herrington's residence when the others arrived. Withers corroborated that Gentry, Bishop, and Johnson gave Henley a ride elsewhere. After they left, Withers testified that he locked the front and back doors of Herrington's residence. Withers then fell asleep in Herrington's living room while Herrington remained in his bedroom talking on his phone.

¶24. According to Withers, he later awoke to a scuffle and saw two people beating Herrington. Withers stated that he got up to help Herrington when a woman fired a gun at him twice. Withers stated that he then ran out the front door of Herrington's residence and hid in the woods. After hiding in the woods about five minutes, Withers testified that he heard two more shots in quick succession, and then he heard a truck drive away. About three minutes later, Withers exited the woods and saw Herrington walking out of his residence. Withers testified that Herrington had a gash on his head and was holding what appeared to be a .38 revolver. Withers rode with Herrington to Herrington's mother's house, and then

11

Withers ran by foot to someone else's home. Withers testified that he never saw drugs or anyone using drugs while at Herrington's house.

¶25. Herrington's mother, Linda Jones, also testified during the defense's case-in-chief. Jones testified that Herrington showed up at her house around 2 a.m. on October 16, bleeding from injuries to his face. Jones further stated that, after Gentry arrived at her house, Gentry and Herrington left together around 3:30 a.m. Jones claimed she had no knowledge of the .357 revolver law enforcement found when they searched her home after the shooting.

¶26. Finally, Herrington testified on his own behalf. Herrington confirmed that he met Gentry a few days prior to the shooting. He denied, however, that he had stayed at Gentry's house for several days and had used drugs with her, Johnson, and Bishop. Herrington also testified that Bishop had sent him a threatening text message the day before the shooting, and he denied knowing that Gentry, Johnson, and Bishop planned to come to his house the evening before the shooting. According to Herrington, he never invited them to his house. In addition, Herrington testified he was unaware that Johnson, Gentry, and Bishop planned to return to his residence after they gave Henley a ride somewhere else. In fact, Herrington testified that, after the others left, he asked Withers to lock the doors to his home. He testified that he and Withers then went to sleep.

¶27. Herrington testified that he was asleep when his bedroom lights later turned on and revealed Gentry, Johnson, and Bishop standing in his bedroom. Herrington said that Bishop tried to hand him a cell phone, and he (Herrington) could hear the person on the other end

12

shouting. Herrington testified that he refused to take the phone, and that Bishop, and perhaps Johnson, jumped on top of him and began hitting him. Herrington further testified that he noticed Bishop had a .357 revolver and a black-sheathed knife stuck in the waistband of his pants. Herrington claimed that he saw Bishop reach for the .357 revolver. Testifying that he feared for his life, Herrington said he grabbed his own firearm from under his pillow and fired twice at Bishop. Although Bishop fell in his lap, Herrington stated he was afraid Bishop would still try to use the .357 revolver to shoot him. As a result, Herrington testified that he fired a third shot at the back of Bishop's head. Herrington claimed the third shot was the only one he fired at the back of Bishop's head, and he said he could not explain the autopsy results showing a second shot to the back of Bishop's head. Herrington further testified, however, that he thought he heard someone else fire two shots before he ever fired his weapon at Bishop.

¶28.     After firing the third shot at Bishop, Herrington stated that he slid from underneath Bishop and took the bullets out of both his and Bishop's guns before placing the weapons on the kitchen table. Herrington testified that he encountered Withers outside his house, and he drove them both to his mother's home. Withers then left, and Herrington waited for Gentry to arrive. Herrington stated that he arrived at his mother's house around 2 a.m. After Gentry arrived, Herrington testified that she rode back with him to his house, where they contacted law enforcement. Herrington stated he also retrieved Gentry's gun, unloaded it, and placed it on the table with the other two weapons.

13

¶29. According to Herrington, he obtained a fourth gun, a .357 revolver, from a man named Wade Pilgrim. Herrington testified that he planned to buy the gun from Pilgrim for $300 and then trade the gun to his stepfather for another weapon. Herrington testified that the gun was given to his stepfather a day or two prior to the shooting, and he denied that he took the gun to his mother and stepfather's house immediately after Bishop's shooting to hide it. Following Herrington's testimony, the defense rested.

¶30. After hearing all the evidence and testimony, the jury convicted Herrington of manslaughter, and the circuit court sentenced him to twenty years in MDOC's custody. Herrington subsequently filed an unsuccessful motion for a new trial. Aggrieved by his conviction and sentence, Herrington appeals.

## DISCUSSION

### I. Whether the circuit court erred by admitting improper opinion testimony.

¶31. The State asserted at trial that Herrington tampered with evidence before he alerted authorities about the shooting. During Deputy Hamilton's direct examination, the State elicited testimony from Deputy Hamilton that he believed Bishop's body was moved after the shooting. On appeal, Herrington contends the circuit court erred by admitting this improper opinion testimony. Based on this alleged error, Herrington requests a new trial.

¶32. This Court reviews the trial court's admission or exclusion of evidence for abuse of discretion. *Cooper v. State*, 200 So. 3d 1065, 1074 (¶32) (Miss. Ct. App. 2016). In the present case, Deputy Hamilton testified as a lay witness and was never tendered as an expert.

14

"Rule 701 of the Mississippi Rules of Evidence allows a lay witness to give opinion testimony in certain limited circumstances." *Ramer v. State*, 156 So. 3d 919, 921 (¶8) (Miss. Ct. App. 2014). As this Court has previously explained:

> Under Rule 701, if the witness is not testifying as an expert witness, his testimony in the form of opinions or inferences is limited to those opinions or inferences that are rationally based on his perception, and helpful to the clear understanding of his testimony or the determination of a fact in issue. Additionally, Rule 701 requires that the witness's testimony must not be based on scientific, technical, or other specialized knowledge.

*Ramer*, 156 So. 3d at 921-22 (¶8) (internal quotation marks omitted).

¶33. During the State's direct examination of Deputy Hamilton, the following exchange occurred:

Prosecutor: Deputy Hamilton, looking at that picture that was just entered into evidence[, i]t looks like there's one spot [on the mattress] with blood and a splatter; is that correct?

Deputy Hamilton: Yes, sir.

Prosecutor: Were you able to gather anything from that [pattern?]

. . . .

Defense Attorney: I would object. He's not qualified to give an opinion as to blood splatter or—

The Court: I would say the question does not require that level of expertise. . . . Objection is overruled.

Deputy Hamilton: In my opinion, it appeared that the body may have been laid across the bed at that point and then moved afterward.

Prosecutor: Okay. Explain to us what you mean[.]

15

Deputy Hamilton:  Most of the blood that was on . . . Bishop was in the facial area. And the spot in the middle of the bed was coagulated blood. So I would assume that his face was actually on that spot at one time.

Prosecutor:  Okay. And when you got [to the crime scene], his face wasn't there?

Deputy Hamilton:  No, sir. He was [lying] on his back across the bed when I arrived.

Prosecutor:  In the position where you found him, was there much blood pooled around him?

Deputy Hamilton:  It was . . . on the floor, from his facial area.

Prosecutor:  So you believe that the body was face down in that one spot—

Deputy Hamilton:  At one point. Yes.

Prosecutor:  —and then rolled over?

Deputy Hamilton:  Yes.

Prosecutor:  But you don't know?

Deputy Hamilton:  I don't know for sure if that's what happened, but that's what it appeared to me.

¶34.   As previously stated, Herrington argues that Deputy Hamilton's testimony constituted improper opinion testimony. Herrington asserts that Deputy Hamilton's testimony delved into crime-scene forensics and reconstruction—areas that require specialized knowledge not possessed by the average person. Upon review, we disagree.

¶35.   In *Smith v. State*, 725 So. 2d 922, 925 (¶7) (Miss. Ct. App. 1998), the trial court

16

admitted an officer's testimony "that the shoe print he observed on the kicked-in back door of the victim's house was, in his opinion, of the 'same pattern' as that found on the sole of a pair of shoes he observed at [the defendant's] house." In finding the officer's testimony admissible under Rule 701, this Court held the officer's observations about shoe-print patterns required no "specialized knowledge to assist the trier of fact." *Smith*, 725 So. 2d at 925-26 (¶7). Instead, we concluded that the officer's "testimony was nothing more than his first-hand observation, rationally based on his personal perceptions[,]" and that his opinion was "helpful to the jury in resolving [an] important factual issue" in the case. *Id.* at 926 (¶7).

¶36. In the present case, Deputy Hamilton testified that, upon arriving at the crime scene, he observed most of the blood on Bishop's body around his "facial area." Deputy Hamilton also noted a large pool of blood in the middle of Herrington's mattress. Because Bishop's body was lying face up on the mattress rather than by the pool of blood, Deputy Hamilton opined that Bishop's body must have been moved at some point. Like in *Smith*, we find Deputy Hamilton's testimony consisted of nothing more than first-hand observations that were rationally based on his personal perceptions and that required no specialized knowledge. *See id.* at 925-26 (¶7). As a result, we find no abuse of discretion in the circuit court's admission of the opinion testimony. *See Cooper*, 200 So. 3d at 1074 (¶32). We therefore find this issue lacks merit.

## II. Whether the circuit court erred by admitting Gentry's four written pretrial statements.

¶37. Herrington further argues the circuit court erroneously admitted into evidence

17

Gentry's four written pretrial statements. According to Herrington, the four pretrial statements constituted hearsay that unfairly prejudiced him. Herrington also claims that the State improperly used Gentry's pretrial statements as substantive evidence to bolster her testimony. As previously acknowledged, we review the circuit court's admission of evidence for abuse of discretion. *See id.*

¶38. Rule 801(d)(1)(B) of the Mississippi Rules of Evidence provides that a witness's prior statement is not hearsay when:

> The declarant testifies and is subject to cross-examination about [the] prior statement, and the statement . . . is consistent with the declarant's testimony and is offered to rebut an express or implied charge that the declarant recently fabricated it or acted from a recent improper influence or motive in so testifying . . . .

¶39. Our caselaw further reinforces that a witness's prior consistent statement is admissible when the witness's credibility and veracity have been attacked. *Swindle v. State*, 755 So. 2d 1158, 1164 (¶14) (Miss. Ct. App. 1999). However, the Mississippi Supreme Court has explained that "[e]vidence of prior consistent statements made by the witness is not evidence of the fact testified to by the witness, but may be offered for the sole purpose of supporting the testimony of the witness whose veracity has been attacked." *Stampley v. State*, 284 So. 2d 305, 307 (Miss. 1973). Thus, the supreme court has warned that the admission of a witness's prior consistent statement "should be received by the [trial] court with great caution and only for the purpose of rebuttal so as to enable the jury to make a correct appraisal of the credibility of the witness." *White v. State*, 616 So. 2d 304, 308 (Miss. 1993) (quoting

18

*Stampley*, 284 So. 2d at 307).

¶40.    In *Swindle*, the defense repeatedly questioned the State's chief witness on cross-examination about inconsistencies between his pretrial statement and his trial testimony. *Swindle*, 755 So. 2d at 1164 (¶12).  On redirect, over the defense's objection, the trial court allowed the State to introduce the witness's pretrial statement into evidence.  *Id.*  On appeal, the defendant claimed the pretrial statement constituted hearsay and improperly bolstered the witness's trial testimony.  *Id.*  In reviewing the issue, however, the supreme court observed that the defense had used the pretrial statement to cross-examine the witness and to challenge his veracity.  *Id.* at (¶15).  As a result of the defense's attack on the witness's veracity, the supreme court held the trial court properly admitted the witness's prior consistent statement for the limited purpose of determining the witness's credibility.  *Id.*

¶41.    In his concurrence to the majority opinion in *Swindle*, Judge Southwick observed that, in ruling upon the issue of the pretrial statement, the trial court simply "determined that[,] since the defense had already discussed the statement at considerable length, it should be admitted into evidence." *Id.* at 1180-81 (¶69) (Southwick, J., concurring).  After discussing Rule 801(d)(1)(B) regarding prior consistent statements, Judge Southwick explained that "even a prior consistent statement can be so selectively used as to appear inconsistent.  That concept seems to merge with [Rule 106 of the Mississippi Rules of Evidence,] another admission[-]of[-]evidence rule[.]" *Swindle*, 755 So. 2d at 1181 (¶72).  Rule 106 provides that, "[i]f a party introduces all or part of a writing or recorded statement, an adverse party

19

may require the introduction, at that time, of any other part—or any other writing or recorded statement—that in fairness ought to be considered at the same time." The comment to Rule 106 explains that "[s]uch a rule attempts to prevent misleading the jury by taking evidence out of context."

¶42.    According to the *Swindle* concurrence, "[e]ven if 'Rule 106 does not necessarily require that all the remainder of a document' be admitted, it does not bar admission of 'that part which ought in fairness to be considered.'" *Swindle*, 755 So. 2d at 1181-82 (¶73) (quoting *Washington v. State*, 726 So. 2d 209, 216 (¶33) (Miss. Ct. App. 1998)). In fact, the purpose of Rule 106 is that, "to 'minimize the inaccuracy of an incomplete presentation of a record, trial courts have the power to determine whether fairness requires the proponent to introduce the whole writing' as relevant to the issues of the case." *Swindle*, 755 So. 2d at 1182 (¶73) (quoting Weinstein's Federal Evidence § 106.02[1] (1998) at 106-5). Furthermore, the *Swindle* concurrence stated that, "even if evidence is otherwise inadmissible, one party can open the door to its admission." *Id.* at (¶74) (quoting *Washington*, 726 So. 2d at 216 (¶34)). For those reasons, the concurrence agreed with the majority in *Swindle* that the trial court properly admitted the witness's prior consistent statement. *Id.* at (¶75).

¶43.    In discussing the nature of the pretrial statement, Judge Southwick stated:

> [The prior statement] need not be identical in every detail to the trial testimony
> to be considered consistent. The test of admissibility is whether a reasonable
> mind would accept the central thrust of the prior statement as being consistent
> with the witness's in-court testimony. I also find that even by using the actual

20

statement that is considered consistent, the defense implicitly charged that what [the witness] was saying on the stand was different than what he had said soon after the shooting. That implies recent fabrication. So long as the central thrust of the prior statement is consistent with the trial testimony, it is a prior consistent statement even if the cross-examining attorney was attempting to show that it was not.

*Id.* (internal citation and quotation marks omitted).

¶44. We find the facts of the instant case are analogous to those presented in *Swindle*. As in *Swindle*, Herrington's attorney broached the topic of Gentry's four pretrial statements on cross-examination and then repeatedly questioned Gentry about any differences existing between her pretrial statements and her trial testimony. The record reflects that, over the course of the cross-examination, Herrington's attorney discussed each of Gentry's four pretrial statements, even reading portions of the statements into evidence.

¶45. As a result of the defense's attempt to discredit Gentry through her pretrial statements, the State sought to admit the four statements into evidence on redirect. The defense objected, arguing that the statements improperly bolstered Gentry's trial testimony. In response, the State argued, "Your Honor, I would point out that[,] during cross-examination, [the defense] referred to these four statements and said that each one was a little different. [The defense's] classification of the evidence allows the jur[ors] to determine that for themselves." After holding that the defense had received the opportunity to fully cross-examine Gentry on each of her individual pretrial statements, the circuit court concluded that the jury was "entitled to know the whole story." As a result, the circuit court overruled the defense's objection and admitted Gentry's four pretrial statements into evidence. Consistent with the circuit court's

21

holding, the record shows that the defense cross-examined Gentry separately on portions of each pretrial statement.

¶46. After the admission of Gentry's pretrial statements, the State asked why Gentry gave four statements. In response, Gentry explained that the law-enforcement officers questioning her knew her clarity would be better once she had more time to calm down from the shooting. Gentry further stated that she was in custody the entire time and no longer using drugs. As a result, by the date she gave her final statement, she was no longer impaired from her drug use before the shooting. Following the State's redirect examination of Gentry, the circuit court allowed the defense to recross-examine her.

¶47. Upon review, we find no abuse of discretion in the circuit court allowing the State to introduce the pretrial statements on redirect to support Gentry's accuracy and credibility. *See Cooper*, 200 So. 3d at 1074 (¶32). By cross-examining Gentry on portions of each of her pretrial statements, Herrington's attorney challenged her veracity as to each statement. *See Swindle*, 755 So. 2d at 1164 (¶15). Furthermore, by using limited portions of each statement, the defense challenged the consistency of the statements. In reading directly, but selectively, from Gentry's prior statements, Herrington's attorney implied that her trial testimony was a recent fabrication that differed from her pretrial statements to law enforcement. *Id.* at 1182 (¶75) (Southwick, J., concurring). However, a review of the entirety of Gentry's four pretrial statements establishes that "a reasonable mind [c]ould accept the central thrust of the prior statement[s] as being consistent with [Gentry's] in-court testimony." *Id.* We therefore find

22

that, not only did the defense open the door to the State's introduction of Gentry's pretrial statements, but as the circuit court ruled, fairness dictated that the jury have access to Gentry's complete statements.[2] Thus, we find this assignment of error lacks merit.

### III.    Whether insufficient evidence supported the verdict.

¶48.    Herrington challenges the sufficiency of the evidence supporting his manslaughter conviction. In considering a challenge to the legal sufficiency of the evidence, "we consider all evidence in the light most favorable to the State[,]" and "[w]e give the State the 'benefit of all favorable inferences reasonably drawn from the evidence.'" *Duke v. State*, 146 So. 3d 401, 405 (¶15) (Miss. Ct. App. 2014) (quoting *Grossley v. State*, 127 So. 3d 1143, 1147 (¶10) (Miss. Ct. App. 2013)). Furthermore, we accept as true all credible evidence consistent with the defendant's guilt. *Id.* "The central question 'is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Grossley*, 127 So. 3d at 1147 (¶10)). "[I]f 'reasonable fair-minded jurors in the exercise of impartial judgment might reach different conclusions on every element of the offense,' the evidence will be deemed to have been sufficient [to sustain the conviction]." *Birge v. State*, 216 So. 3d 1174, 1177 (¶11) (Miss. Ct. App. 2017) (quoting *Bush v. State*, 895 So. 2d 836, 843 (¶16) (Miss. 2005)).

---

[2] *See* M.R.E. 106; *Esco v. State*, 9 So. 3d 1156, 1163 (¶¶29-31) (Miss. Ct. App. 2008); *Washington*, 726 So. 2d at 216 (¶¶33-34).

¶49. Manslaughter is "[t]he killing of a human being, without malice, in the heat of passion, but in a cruel or unusual manner, or by the use of a dangerous weapon, without authority of law, and not in necessary self-defense." Miss. Code Ann. § 97-3-35. Mississippi Code Annotated section 97-3-15(1)(e)-(f) (Rev. 2014) provides that the killing of a human being is justifiable:

> (e)   When committed by any person in resisting any attempt unlawfully to kill such person or to commit any felony upon him, or upon or in any dwelling, in any occupied vehicle, in any place of business, in any place of employment or in the immediate premises thereof in which such person shall be;

> (f)   When committed in the lawful defense of one's own person or any other human being, where there shall be reasonable ground to apprehend a design to commit a felony or to do some great personal injury, and there shall be imminent danger of such design being accomplished[.]

Where a defendant claims self-defense, "the State bears the burden of proving beyond a reasonable doubt that the defendant was not acting in necessary self-defense." *Birge*, 216 So. 3d at 1177 (¶12) (quoting *Harris v. State*, 937 So. 2d 474, 481 (¶23) (Miss. Ct. App. 2006)).

¶50. Herrington argues that the circumstances surrounding Bishop's death demonstrate a clear case of self-defense and justifiable homicide. He further asserts that the State failed to prove beyond a reasonable doubt that he did not act in necessary self-defense at the time of Bishop's shooting. As a result, he contends insufficient evidence supported his guilty verdict.

24

¶51. The jury heard undisputed evidence from multiple witnesses that Bishop initiated the fight with Herrington. Herrington asserted at trial that it "[f]elt like I was getting the life beat out of me." However, Herrington testified that he never sought medical treatment for any injuries. Furthermore, Herrington claimed that he never feared for his life until he saw Bishop reach for a weapon.

¶52. According to Herrington, Bishop reached for a .357 revolver during the fight, which prompted Herrington to retrieve his own gun and fire three times. The State presented evidence, however, to rebut Herrington's assertion that the situation necessitated deadly force. As Investigator Baysinger observed during his testimony, no other evidence supported or corroborated Herrington's claim that Bishop ever had a gun in his possession. Gentry testified that she never saw Bishop in possession of a gun the day of or just prior to the shooting. Johnson, who testified that he actually saw Herrington fire two shots toward Bishop's head, also stated that he never saw Bishop in possession of a gun. Furthermore, Investigator Baysinger testified that no prints were recovered from the .357 revolver that Herrington claimed belonged to Bishop.

¶53. Despite Johnson's testimony that he saw Herrington fire two shots toward Bishop's head, Herrington asserted that he only shot Bishop once in the back of the head after Bishop fell in his lap and continued to move while holding a gun. As the jury heard, however, the autopsy revealed Bishop sustained one shot to his torso and two shots to the back of his head. The autopsy further showed that the two shots to the back of Bishop's head were so close in

25

proximity to each other that the bullets entered his skull at one common point and traveled a similar path.

¶54. Testimony from multiple witnesses established that Herrington failed to alert law enforcement about the shooting until almost two hours after the fact. Gentry testified that, upon returning with Herrington to his residence, he immediately began gathering up items. Gentry stated that Herrington then gave her a phone and told her exactly what to say before instructing her to contact the authorities. Before the authorities arrived, Gentry testified that Herrington used a second phone to take a picture of Bishop's body and to send the picture to someone. Although Herrington claimed that he never moved Bishop's body, Deputy Hamilton testified that it appeared the body had been moved before authorities arrived. Deputy Hamilton stated there was coagulated blood pooled in the center of Herrington's mattress as though Bishop's face had rested there. However, when Deputy Hamilton entered Herrington's bedroom, Bishop's body lay face up across the corner of the mattress as though someone had rolled Bishop over.

¶55. Gentry further stated that, while waiting for the authorities to arrive, she overheard part of a phone conversation in which Herrington said, "[N]o, we'd have to burn my whole trailer down[] if we did that." Gentry testified that she assumed Herrington and the other person were discussing how to dispose of Bishop's body. Gentry also claimed that, after she put her .380 pistol on the kitchen table and Herrington put his .38 revolver and a .357 revolver on the table, Herrington retrieved a fourth gun, the stolen .357 revolver. Gentry

26

claimed that Herrington exited the house with the stolen gun and disposed of the weapon. According to Investigator Baysinger, authorities later recovered the .357 revolver from Herrington's mother's house.

¶56.    Viewing the evidence in the light most favorable to the State, we find sufficient evidence existed for a rational trier of fact to find the State met the essential elements of manslaughter beyond a reasonable doubt. *See Duke*, 146 So. 3d at 405 (¶15).

IV.    **Whether the verdict was against the overwhelming weight of the evidence.**

¶57.    Herrington also contends that his guilty verdict is contrary to the weight of the evidence. In responding to this claim, the State correctly points out that Herrington untimely filed his motion for a new trial. "Uniform Rule of Circuit and County Court 10.05[3] requires that a motion for [a] new trial must be made within ten days of the judgment . . . ." *Allen v. State*, 200 So. 3d 1100, 1101 (¶2) (Miss. Ct. App. 2016) (footnote added and citation omitted). Herrington's judgment of conviction was filed on August 15, 2016. Thus, Herrington had until August 25, 2016, to timely file a motion for a new trial. *See id.* However, Herrington's attorney did not even sign and submit the posttrial motion to the circuit court until September 7, 2016, which was well outside the ten-day time period. We therefore find no error in the circuit court's denial of Herrington's motion for a new trial.

---

[3] Effective July 1, 2017, the Mississippi Rules of Criminal Procedure superseded the Uniform Rules of Circuit and County Court. However, at the time of Herrington's judgment of conviction, the Uniform Rules of Circuit and County Court still applied.

**V.    Whether resentencing or sentence clarification is needed.**

¶58.    At the conclusion of Herrington's trial, the circuit court sentenced him to twenty years in MDOC's custody "as a matter of law, albeit, without parole . . . [to be served] day for day." On appeal, Herrington acknowledges that his twenty-year sentence complies with the statutory maximum provided by section 97-3-25(1). He contends, however, that he was never indicted as a habitual offender or pursuant to a sentence enhancement. As a result, Herrington questions whether the circuit court believed that his sentence was required to be twenty years "as a matter of law." Herrington asks that, if this Court affirms his conviction, we remand his case for resentencing or for clarification as to whether the circuit court felt legally obligated to sentence him to the statutory maximum of twenty years.

¶59.    As Herrington contends, he was neither indicted nor convicted pursuant to the habitual-offender statute or a sentence enhancement. Despite the circuit court's pronouncement in open court that Herrington was sentenced to twenty years "as a matter of law, albeit, without parole . . . [to be served] day for day[,]" the sentencing order makes no mention of parole ineligibility or a day-for-day requirement. Instead, the sentencing order simply states, "The Defendant, . . . Herrington, is sentenced to serve a term of twenty (20) years in the custody of [MDOC]."

¶60.    As discussed, Herrington was sentenced under section 97-3-25(1), which permits a sentencing range from two to twenty years in MDOC's custody for anyone convicted of manslaughter. Thus, Herrington's sentence falls within the permissible range provided by

28

statute. "In general, a sentence which falls within the permissible range designated by statute will not be disturbed on appeal." *Hayes v. State*, 203 So. 3d 1144, 1146 (¶5) (Miss. Ct. App. 2016) (quoting *McCline v. State*, 856 So. 2d 556, 560 (¶18) (Miss. Ct. App. 2003)). Furthermore, "we have recognized that 'it is well-settled law in Mississippi that a written order prevails over a conflicting oral pronouncement.'" *Weary v. State*, 155 So. 3d 866, 869 (¶9) (Miss. Ct. App. 2013) (quoting *Jones v. State*, 70 So. 3d 255, 259 (¶12) (Miss. Ct. App. 2011)). Accordingly, because Herrington's sentencing order complies with statutory guidelines, we decline to disturb his sentence on appeal. This assignment of error lacks merit.

¶61. We affirm Herrington's conviction and sentence.

¶62. **AFFIRMED.**

**LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, FAIR, WILSON, GREENLEE AND WESTBROOKS, JJ., CONCUR.**