311 So.2d 654 (1975)
Alex NULL
v.
STATE of Mississippi.
No. 48438.
Supreme Court of Mississippi.
April 28, 1975.
*655 Charles R. Wilbanks, Corinth, for appellant.
A.F. Summer, Atty. Gen. by Billy L. Gore, Sp. Asst. Atty. Gen., Jackson, for appellee.
Before RODGERS, INZER and WALKER, JJ.
WALKER, Justice, for the Court:
The appellant was indicted and tried for the murder of his wife, Ruby Null, in the Circuit Court of Alcorn County, Mississippi. The jury returned a verdict of manslaughter, and he was sentenced to a term of ten years in the state penitentiary. From that conviction and sentence, appellant prosecutes this appeal. We affirm.
Appellant first contends that the trial court erred in failing to grant his peremptory instruction requested at the close of all the evidence under the authority of Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933). The rule in Weathersby is that where the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.
*656 Appellant submits that in the instant case his version of what happened must be taken as true because it was reasonable and was not substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge.
The record reflects that on June 19, 1973, the date of the tragic event, the appellant, the decedent and appellant's granddaughter were all at appellant's house. The granddaughter testified that she had gone to appellant's house that afternoon to spend the night with them and after watching television that night, she went to bed about ten o'clock p.m. Her bedroom adjoined the decedent's bedroom, and there was an opening for a door but no door was hung. After she had gone to sleep, she was awakened by what she thought were gunshots. From her position in the bed she saw her grandfather with blood on his face and chest walking through the house. She got up and observed the decedent covered in blood lying on the bed while the appellant was in the other part of the house. As appellant returned, she observed that he had a gun. It was also the granddaughter's testimony that after she woke up, but before she got out of bed, she heard the decedent say, "Don't shoot me." Following this statement by the decedent, she heard gunshots but was not sure how many. While appellant was in the other part of the house, she dressed and got back in bed as he came back to his room. Appellant then sat down but got back up a short time later and again went through the house whereupon the granddaughter crawled out the window by the side of her bed and went to a neighbor's house for help. She did not see appellant fire the gun but she did know that he had a shotgun in his hand while he was walking through the house.
In response to the granddaughter's request for help, the decedent's son-in-law went to appellant's house, entering it through a window. Upon walking to the back bedroom he observed the bloody body of the decedent, lying in the middle of the bed, the appellant lying on the foot of the bed with one leg off on the floor, and a shotgun lying near appellant's leg. The decedent's brother also was on the scene, and he observed the position of appellant and the decedent, a bolt-action shotgun lying at the end of appellant's hand, and six empty shotgun hulls lying on the floor.
Shortly thereafter, a deputy sheriff arrived at the scene and discovered that the decedent had three wounds in her body. He described the wounds as between a quarter and a half dollar each in size but found no evidence of powder burns. A .20 gauge shotgun was lying beside the bed, and two holes were found in the ceiling over the bed. There was blood from the bedroom where decedent's body was found, through the living room and into the bedroom on the south side of the house.
The record further reflects that the decedent had suffered two gunshot wounds to the abdomen in the vicinity of the diaphragm and one wound to the head starting at the right side of the chin (about the middle of the lower portion of the chin), and then proceeding across the cheek and into the lower portion of the left ear.
Appellant offered his version of the event as follows:
On the date in question he came home with his granddaughter and found that the decedent was depressed as she had been for some time over the loss of her baby boy who was killed in a car wreck about a year before decedent's death. On several occasions, she allegedly discussed with him how bad it hurt and how hard it was for her to take it. She never threatened or attempted to take her life before, but did tell him one time that she started to take some sleeping pills but did not do it. After supper the granddaughter went into the living room to watch television, and he and the decedent cleaned up the kitchen. Afterwards they went into the living room, sat down, talked to the granddaughter and *657 played records. When the granddaughter had gone to bed, he and the decedent went to the bathroom in preparation for bed. At this time the decedent was discussing her feelings about the loss of the child. Appellant stated that the decedent told him that "It's just almost more than I can stand" and "It seems to me that he is so near that I can feel him touch me." Appellant then went to the bedroom and laid down on the foot of the bed. As he was lying there, the decedent came in and said, "I'm going to shoot myself." When she spoke these words, he said she had the shotgun in her hand. He started toward her, and she came around to the back of the bed which was about twelve inches or so from the wall. As she came to the foot of the bed, she tripped and fell with the gun accidentally firing as she was falling. Before he could get to her and as he was touching her feet in an attempt to reach her, she shot herself again. Appellant did not know where any of the shots struck, and when he reached her, he took the gun, laid it down and held her in his arms. After holding her, he stated that he said, "My darling, I want to go with you," after which he reached, obtained the gun, stuck it in his mouth and shot himself. He did not remember anything else.
It was brought out on cross-examination of appellant that the shotgun was his; that it would hold a total of three shells; that the bolt-action mechanism had to be operated before it would fire; that he did not know where the first shot hit decedent; and that he could not reach her before she had bolted the gun and shot herself the second time. Appellant did not know how the gun was reloaded, how the shots were fired into the ceiling, and neither remembered reloading the gun nor walking through the house.
After the appellant had testified, a daughter of the decedent testified that the decedent's child had been killed in a car wreck almost three years prior to her mother's death, and she never saw her mother brooding over the death of the child. She also stated that her mother was about five feet three inches tall (she made most of her mother's clothes), and she was about an inch taller than her mother. In the presence of the jury, she was allowed to take the gun, point the barrel at herself and try to reach the trigger which she was unable to do. No objection was made by appellant to this test, and he did not cross-examine this witness.
In our opinion, this is not one of the rare cases which meets all of the requirements of the Weathersby rule. The many contradictions in the appellant's own testimony as to material matters, the physical facts and the contradiction of the appellant by other credible witnesses in material particulars clearly establish the fact that the rule announced in Weathersby is not applicable. By way of specifics, we would point out that (1) appellant stated that the decedent said, "I'm going to shoot myself," whereas the granddaughter positively stated that the decedent said, "Don't shoot me"; (2) appellant stated that the decedent shot herself twice whereas the evidence clearly shows that she had been shot three times; (3) appellant claims that the decedent shot herself, but no evidence of powder burns were found even though certain tests conducted showed that powder burns probably would have been left; (4) appellant testified that the decedent had been despondent over the death of a child which occurred a year earlier, whereas other testimony showed that the child had died almost three years ago, and the decedent had not evidenced any such despondency even to her daughter; (5) the record reflects that it would have been virtually impossible for a woman of decedent's stature to have inflicted one wound upon herself much less two or three; (6) the shotgun from which the decedent died was bolt-action and therefore had to be bolted each time before it was shot; and (7) at the time the granddaughter left the house to seek help, the appellant was walking around the house with the gun in his hand.
*658 Not only is appellant's version contradicted in material particulars, it also reaches into the realm of unreasonableness.
In considering the reasonableness of the defendant's version of what occurred, the jury was entitled to consider whether or not it was in accord with human experience and matters of common knowledge that the decedent, after the first shot, could have twice reloaded the bolt-action shotgun and shot herself again. See Herrin v. State, 201 Miss. 595, 29 So.2d 452 (1947). Accordingly, we reach the conclusion that the trial court was correct in refusing appellant's request for a peremptory instruction of not guilty.
We would also point out that whether an accused is entitled to the benefit of the Weathersby rule is a question for the court and is not a proper subject of an instruction to the jury.
Appellant next complains that the trial court erred in granting the state a requested instruction on malice aforethought. We need not discuss the merits of the instruction here in light of the fact that a defendant who has been convicted of manslaughter may not complain at the giving of a murder instruction. Bragg v. State, 210 So.2d 652 (Miss. 1968).
It is also appellant's contention that the verdict of the jury was contrary to the law and the evidence in the case. The jury was presented with conflicting evidence with regard to the manner in which the decedent met her death. It considered the conflicting evidence on appellant's guilt but resolved the conflict against appellant. As the jury is the sole judge of the weight and credibility of witnesses, we cannot now say that its verdict was against the overwhelming weight of the evidence. Minor v. State, 302 So.2d 248 (Miss. 1974).
We have thoroughly considered the other assignments of error in appellant's well-prepared brief and find them to be without merit.
Affirmed.
GILLESPIE, C.J., and PATTERSON, SMITH, ROBERTSON, SUGG and BROOM, JJ., concur.