# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2023-KA-01244-COA

**DAVID SWIMS A/K/A DAVID LEE SWIMS, JR.**            **APPELLANT**
**A/K/A DAVID SWIMS, JR.**

**v.**

**STATE OF MISSISSIPPI**            **APPELLEE**

| | |
|---|---|
| DATE OF JUDGMENT: | 10/30/2023 |
| TRIAL JUDGE: | HON. GRADY FRANKLIN TOLLISON III |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF STATE PUBLIC DEFENDER |
| | BY: W. DANIEL HINCHCLIFF |
| |     STACY FERRARO |
| ATTORNEY FOR APPELLEE: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: ALLISON ELIZABETH HORNE |
| DISTRICT ATTORNEY: | BENJAMIN F. CREEKMORE |
| NATURE OF THE CASE: | CRIMINAL - FELONY |
| DISPOSITION: | AFFIRMED - 08/05/2025 |
| MOTION FOR REHEARING FILED: | |

**EN BANC.**

**WILSON, P.J., FOR THE COURT:**

¶1. A jury convicted David Swims of second-degree murder for killing his wife and possession of a firearm as a felon. The court sentenced him to concurrent terms of forty years and ten years in the custody of the Department of Corrections. After the court denied his motion for a new trial, Swims appealed and argues that the trial court erred by (1) refusing a jury instruction based on *Weathersby v. State*, 165 Miss. 207, 147 So. 481 (1933), (2) allowing opinion testimony from an investigator, and (3) allowing testimony from a pathologist who "mere[ly] parrot[ed]" the opinions of the non-testifying pathologist who

performed the autopsy.  We find no reversible error and affirm.

## FACTS AND PROCEDURAL HISTORY

¶2.     Swims and his wife Anteeatta "T" Swims married in 2010 and moved to Oxford in 2015.  Swims uses a wheelchair as a result of injuries he sustained in a motorcycle accident before he married T.  By June 2021, the marital relationship had greatly deteriorated, and Swims and T had agreed to divorce and slept in separate bedrooms.

¶3.     Swims worked at a computer and cellphone repair company in Oxford.  On June 11, 2021, one of Swims's coworkers called to check on him because he had missed work and had sent strange text messages to some of his coworkers.  Swims told his coworker that he had shot T a few days earlier.  The coworker told their boss what Swims had said, and their boss called 911.  The 911 dispatcher sent deputies from the Lafayette County Sheriff's Department to Swims's home.

¶4.     The dispatcher then called Swims and asked if everything was okay with him and his wife.  Swims responded, "No, it's not."  Swims stated that T had come at him with a knife before eventually going to her bedroom.  Swims stated that when he later entered the bedroom looking for his shoes, T jumped off the bed with a knife and said, "Didn't I tell you to stay up out of here?  Get out of here!"  Swims stated that T started coming at him with the knife again, and he could tell by the look in her eyes that she was "serious" and was "gonna try to do something."  Swims stated that he panicked and shot and killed T.  The dispatcher asked what Swims had done with the gun, and Swims said that he had two guns with him.  The dispatcher told Swims to leave the guns in the kitchen and to meet the responding

2

deputies outside. Swims surrendered to deputies outside the house.

¶5.     Deputies found two pistols in the kitchen. T's body was on the floor of the back bedroom of the house in the doorway to the bathroom. T was wearing only panties and had been covered with a blanket. She had been shot once in the chest with an exit wound in her back, once in the right leg, and once in the left leg. Captain Jarett Bundren, the lead investigator on the case, testified that T's body appeared to have been moved because relatively little blood had soaked into the carpet beneath the exit wound in her back, although small pools of blood had collected beneath all three exit wounds. Also, there appeared to be blood on the bottom of T's foot that did not correspond to any of her wounds, suggesting that "somebody grabbed her from the bottom of her feet." Bundren found a knife and more blood in the bathroom. He testified that the blood in the bathroom appeared to have been "smeared around" in an apparent effort to clean it up. The knife "didn't have any blood on it" and looked "like it was placed there." Bundren identified three bullet holes—one in the bathroom door and two in the wall near the bathroom door. He also found the three projectiles corresponding to the bullet holes. Three shell casings were found inside a small "tube" or "bottle" in a bedside table in a different bedroom. Swims did not have any knife wounds or other injuries when he was taken into custody.

¶6.     At trial, Dr. Mark LeVaughn was tendered as an expert in the field of forensic pathology. LeVaughn acknowledged in his voir dire testimony that he did not "personally examine" T's body or perform the autopsy. Swims objected to LeVaughn's testifying on that ground and because the State had not designated him as an expert. However, the trial court

3

overruled Swims's objection and allowed LeVaughn to testify as an expert. The written autopsy report prepared by Dr. David Arboe, who did not testify at trial, was also admitted into evidence over Swims's objection. LeVaughn then testified as follows:

> Q. So Dr. LeVaughn, based on the autopsy report, can you describe to the jury the injuries that were received by Mrs. Swims?
>
> A. The examination documented three gunshot wounds. One was to the chest, another to the right leg and another to the left leg.

The autopsy photographs were also admitted into evidence over Swims's objection. For the remainder of LeVaughn's testimony on direct examination, he utilized the autopsy photos to describe the three entry wounds, bullet paths, and exit wounds to the jury. LeVaughn testified that T's cause of death was multiple gunshot wounds and that the cause of death was homicide. On cross-examination, LeVaughn testified that a postmortem toxicology test showed that T's blood-alcohol concentration was .034.

¶7. After the State rested its case-in-chief, Swims testified in his own defense. Swims testified that he had caught T cheating on him on multiple occasions with different men. Prior to T's death, Swims and T argued frequently and slept in separate bedrooms. Although Swims did not want a divorce, he had agreed to a divorce because T "wanted a divorce" and "was adamant about it." On June 8, 2021, Swims returned home from work around 5:30 p.m. and offered to cook dinner for T. According to Swims, T "was drinking her wine" and said, "I don't need you to do a damn thing for me." Swims testified that he went outside to avoid an argument, but T followed him outside. Swims stated that he remained on the house's outside deck "for a good portion of the night" to avoid T.

4

¶8.     The next morning, Swims knocked on T's bedroom door because his shoes were in that room. T eventually opened the door. According to Swims, T "sleeps nude" and "was still in the nude" and drinking wine when she opened the door. Swims testified that as he was looking for his shoes, T began arguing and cursing at him again and then "shoved [him] a little bit." He testified that he "caught [him]self on the bed," "pushed [him]self back up," and then "cursed her out." Swims and T's argument continued and became "heated." Swims testified that he then told T that he "was having a relationship" with her sister. According to Swims, T responded, "[T]hat better not be true or I'm going to F you up." Swims testified that he then pulled out his phone and began to play video and audio recordings of him and T's sister having sex. He testified that T "lost it" at that point, and he could tell by the "look that was on her face . . . that she was about to do something." Swims claimed that T then picked up and unsheathed a knife. He testified that he told T she had "better put down that f'ing knife," and then he picked up T's gun, which she kept on her bedside table. Swims testified that he and T continued to argue until "there was a point on the audio sound [on his phone] that you could clearly hear [T's sister] moaning and groaning." Swims claimed that at that point, T "lunged" at him, and he tried to back up and began "tilting back" in his wheelchair. Swims claimed that as he was tilting back in his wheelchair, he fired the gun three times in quick succession but "wasn't looking to where [he] was aiming." Swims testified that T stumbled back and fell into the bathroom door. Swims stated that he moved T's body while trying to resuscitate her and wiped up some of the blood in the bathroom because he "didn't want to get blood all over [himself]."

5

¶9. Swims testified that he did not call the police because he was "devastated" and "panicked." He said that "accidentally shooting someone that [he] love[d] and care[d] for" and "ha[d] been with for over ten years" was very "traumatic" for him. Swims testified that he took several Ambien to go to sleep that night. The next day, he stopped by his place of work to return some keys. He testified that he wanted to kill himself but could not bring himself to do it. On June 11, a coworker called to check on him, and he told her what happened. Later, as recounted above, he surrendered to law enforcement.

¶10. Swims was cross-examined extensively about text messages that he and T exchanged in the two weeks leading up to her death. The messages show that Swims was angry because he believed that T was cheating on him, and T wanted a divorce. Swims tried to persuade T to reconcile and continue the marriage, but T insisted that she wanted a divorce. Swims rested his defense after his testimony.

¶11. The court instructed the jury on the indicted offense of first-degree murder, self-defense, the lesser-included offenses of second-degree murder and imperfect self-defense manslaughter, and the offense of possession of a firearm by a felon. The jury found Swims guilty of second-degree murder and possession of a firearm by a felon. The court sentenced Swims to concurrent terms of forty years (with two years suspended and thirty-eight years to serve) and ten years in the custody of the Department of Corrections. Swims filed a motion for a new trial, which was denied, and a notice of appeal.

**ANALYSIS**

I.     *Weathersby* Instruction

6

¶12.    In his first issue on appeal, Swims argues that the trial court erred by refusing to give his proposed "*Weathersby* instruction." In 1933, the Mississippi Supreme Court held that "where the defendant or the defendant's witnesses are the only eyewitnesses to the homicide, their version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge." *Weathersby*, 165 Miss. at 209, 147 So. at 482. At trial, Swims requested a jury instruction tracking this quote from the *Weathersby* opinion, but the trial court refused the instruction.

¶13.    The trial court correctly refused Swims's proposed instruction. The Mississippi Supreme Court has held it is "clear" that "[t]he *Weathersby* rule . . . **is not a jury instruction**, but a guide for the circuit judge in determining whether a defendant is entitled to a directed verdict." *Blanks v. State*, 547 So. 2d 29, 34 (Miss. 1989) (emphasis added). In *Thomas v. State*, 818 So. 2d 335, 349-50 (¶¶48-50) (Miss. 2002), the defendant argued that the trial court erred by refusing an instruction nearly identical to the one Swims requested here. The Supreme Court held that the defendant's argument was without merit because "the *Weathersby* rule is not a jury instruction." *Id.* at 349 (¶50) (ellipsis and brackets omitted) (quoting *Blanks*, 547 So. 2d at 34); *accord, e.g.*, *Green v. State*, 631 So. 2d 167, 175 (Miss. 1994) ("[T]he *Weathersby* Rule is not the proper subject of an instruction to the jury." (quoting *Windham v. State*, 602 So. 2d 798, 800 n.3 (Miss. 1992), and *Griffin v. State*, 495 So. 2d 1352, 1355 (Miss. 1986))); *Mullins v. State*, 493 So. 2d 971, 975 (Miss. 1986) (same); *Berry v. State*, 455 So. 2d 774, 776 (Miss. 1984) (same); *Sartain v. State*, 311 So. 2d 343,

7

344 (Miss. 1975) (same); *Null v. State*, 311 So. 2d 654, 658 (Miss. 1975) (same); *Wise v. State*, 263 So. 3d 668, 674 (¶28) (Miss. Ct. App. 2018) (holding that the trial court properly refused the defendant's request for a *Weathersby* instruction because "the *Weathersby* rule is not the proper subject of an instruction to the jury" (brackets omitted)). Given this long line of precedent holding that the *Weathersby* rule is not a proper subject of a jury instruction, Swims's claim that the trial court erred by refusing such an instruction is without merit.[1]

## II.     Captain Bundren's Testimony

¶14.     Swims next argues that the trial court erred by allowing the lead investigator, Bundren, to give impermissible expert opinions without being tendered or qualified as an expert. Swims takes issue with several aspects of Bundren's testimony.

¶15.     "A trial court's admission of testimony is reviewed for an abuse of discretion." *Chaupette v. State*, 136 So. 3d 1041, 1045 (¶7) (Miss. 2014). Moreover, even if we find that the trial court abused its discretion, "we may reverse a case only if[] the admission or exclusion of evidence results in prejudice and harm or adversely affects a substantial right of a party." *Id.* (quotation marks omitted). "We will not reverse a conviction based on a

---

[1] Although the trial court properly refused Swims's proposed jury instruction because the *Weathersby* rule is not a proper subject for a jury instruction, we also note that the rule does not apply in this case. Our Supreme Court long ago observed that "[t]he *Weathersby* case has been almost worn threadbare by the efforts of defendants to come within its rule. It is a rare case that meets all of the requirements of the rule." *Murphy v. State*, 232 Miss. 424, 430, 99 So. 2d 595, 598 (1958). One limitation on the rule is that "it is inapplicable when the defendant's conduct and statements following the killing are inconsistent with his version of the events as recounted at trial." *Parvin v. State*, 113 So. 3d 1243, 1252 (¶34) (Miss. 2013) (quotation marks omitted). The rule does not apply in this case because the version of events that Swims recounted to the 911 dispatcher materially varied from the version he later recounted at trial.

harmless error." *Id.* at 1047 (¶12).

¶16.　Bundren testified that the fact that T was dead for two days before Swims told anyone suggested that Swims had been "[t]rying to cover up a crime scene" but "didn't know what to do." Swims objected that Bundren's testimony was "speculation" and beyond "his personal knowledge" and argued that Bundren "ha[d] not been designated as any type of expert in . . . psychoanalysis." The State responded that Bundren was simply explaining the "course of his investigation." The trial court overruled Swims's objection, stating that Bundren could explain "the course of the investigation." We cannot say that the trial court abused its discretion by overruling Swims's objection or that Swims suffered any prejudice as a result. A fairly obvious inference that may be drawn from Swims's failure to report the shooting is that he may have been trying to cover up a crime. This inference helped explain Bundren's investigation. Moreover, Swims himself testified that he tried to clean up some of T's blood, moved her body, and moved shell casings.

¶17.　Bundren testified without objection that blood in the bathroom appeared to have been cleaned up or moved around and that the blood on the bottom of T's foot suggested someone grabbed her foot in an effort to move her body. Because Swims did not object to this testimony at trial, the issue is procedurally barred on appeal. *Chase v. State*, 645 So. 2d 829, 835, 848 (Miss. 1994). Moreover, Swims was not prejudiced by this testimony because Swims testified that he tried to clean up some of the blood and tried to move T's body.

¶18.　Bundren also testified that he believed T's body had been moved because relatively little blood had "soaked into the carpet" from the exit wound in T's back and because blood

9

appeared to have been cleaned up or moved around in the bathroom. Swims objected that Bundren had not been tendered as an expert regarding "blood splatter or any type of medical field." In response, the State argued that Bundren's testimony was permissible "lay opinion [regarding] his observations." The trial court overruled Swims's objection.

¶19. Under Mississippi Rule of Evidence 701, a lay witness may testify to an opinion that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." MRE 701. In *Herrington v. State*, 242 So. 3d 909 (Miss. Ct. App. 2017), a deputy "testified that, upon arriving at the crime scene, he observed most of the blood on [the victim's] body around his facial area." *Id.* at 917 (¶36) (quotation marks omitted). The victim's body "lay face up across the corner of the mattress," but the deputy "noted a large pool of blood in the middle of [the] mattress." *Id.* at 917, 922 (¶¶36, 54). "Because [the victim's] body was lying face up on the mattress rather than by the pool of blood, [the deputy] opined that [the] body must have been moved at some point." *Id.* at 917 (¶36). We held that the trial court did not abuse its discretion by allowing this testimony because the deputy's opinion was "rationally based on his personal perceptions and . . . required no specialized knowledge." *Id.*

¶20. We reach the same conclusion in this case. Bundren's testimony about the blood on the carpet and in the bathroom was rationally based on his own personal observations. It did not involve or require any scientific, technical, or specialized knowledge under Rule 702. Therefore, the trial court did not abuse its discretion by overruling Swims's objection.

10

Moreover, we note that Swims was not prejudiced by this testimony because Swims himself testified that T fell into the bathroom after he shot her and that he "pulled her out of the [bathroom]" after the fact.

### III.  Dr. LeVaughn's Testimony

¶21.    The final issue that Swims raises on appeal is "whether the [trial] court erred in allowing expert testimony as to autopsy results where the testimonial opinion was not made on personal knowledge, but was mere parroting [of] the opinion found in the original report of the actual forensic pathologist." Swims argues that LeVaughn's testimony "based on" Dr. Arboe's report violated his rights under the Confrontation Clause of the United States Constitution as interpreted in *Crawford v. Washington*, 541 U.S. 36 (2004), and *Melendez-Diaz v. Massachusetts*, 557 U.S. 305 (2009), because LeVaughn merely "parrot[ed]" or "channel[ed]" the absent Arboe.[2]

¶22.    In its brief, the State correctly notes that on appeal "Swims challenges only Dr. LeVaughn's testimony and makes no claim about the admission of [Dr. Arboe's] autopsy report or [the autopsy] photographs." Nonetheless, Swims did object to the autopsy report at trial, and we conclude that Arboe's signed autopsy report was testimonial hearsay and

---

[2] The dissent asserts that "the State did not properly designate LeVaughn as an expert witness" under Rule 17.2(4) of the Mississippi Rules of Criminal Procedure. However, Swims does not raise this issue on appeal. During the trial, when the judge asked Swims's attorney whether LeVaughn had been disclosed as an expert witness, counsel stated, "I don't know if he was." The prosecutor then stated that he had "discussed LeVaughn coming up to testify" with defense counsel "months" earlier. The State's discovery disclosures are not part of the record on appeal. *See* MRCrP 17.6(d) ("Discovery material shall not be filed with the clerk unless authorized by the court."). Therefore, the record does not show whether Dr. LeVaughn was properly disclosed. In any event, Swims does not raise any alleged discovery violation on appeal.

should not have been admitted into evidence.[3]

¶23.   We also agree with Swims that LeVaughn improperly testified as follows:

>   Q.   So Dr. LeVaughn, *based on the autopsy report*, can you describe to the jury the injuries that were received by Mrs. Swims?
>
>   A.   *The examination documented* three gunshot wounds. One was to the chest, another to the right leg and another to the left leg.

(Emphasis added).  This specific portion of LeVaughn's testimony is inconsistent with the Confrontation Clause, as interpreted by the United States Supreme Court, because it simply repeats a finding from Arboe's autopsy report—a testimonial out-of-court statement—and it was offered for the truth of the matter asserted.  *See Smith*, 602 U.S. at 802-03.

¶24.   However, the bulk of LeVaughn's testimony consisted of his own opinions based on his own review of the autopsy photos.  Throughout his testimony, LeVaughn used the autopsy photos, which were admitted into evidence, to explain his opinions to the jury.  This testimony did *not* violate the Confrontation Clause.  Our Supreme Court addressed this issue in *Christian v. State*, 207 So. 3d 1207 (Miss. 2016).  There, the Court stated:

---

[3] Some autopsy reports may not qualify as "testimonial."  However, Arboe prepared this report after Swims had been arrested for T's murder. Arboe found that the manner of death was "Homicide," and in signing the report, Arboe affirmed that "[t]he facts stated [t]herein [were] correct to the best of [his] knowledge and belief."  Under these circumstances, the report would seem to qualify as "testimonial" under any of the varied definitions of that term the United States Supreme Court has offered. *See Smith v. Arizona*, 602 U.S. 799, 800 (2024) (stating that determining whether a statement is "testimonial" "focuses on the 'primary purpose' of the statement, and in particular on how it relates to a future criminal proceeding"—but acknowledging that the Court has articulated "varied formulations of [that] standard"); *Franklin v. New York*, 145 S. Ct. 831, 834-35 (2025) (Gorsuch, J., respecting the denial of certiorari) ("[E]ven after years of toiling . . . , our cases have never quite settled on what the primary-purpose test *is*. As we candidly acknowledged last year in *Smith*, the Court has offered a number of 'varied' and seemingly inconsistent 'formulations.'").

At trial, over Christian's objection, the State tendered Dr. Erin Barnhart as an expert in the field of pathology from the Mississippi State Medical Examiner's Office. Dr. Barnhart did not participate in any respect in the victims' autopsies. Both autopsies were performed by Dr. Adel Shaker, who did not testify, and who was no longer working at the Mississippi State Medical Examiner's Office. Dr. Barnhart testified that, although she did not perform the actual autopsy procedures, she examined the autopsy reports, along with the photographs and case notes. And she concluded based on a reasonable degree of medical certainty that Carter and Marks died from gunshot wounds. We find no violation.

. . . .

. . . Dr. Shaker's notes were not admitted in evidence, and Dr. Barnhart did not relay the content of those notes through her testimony. Instead, while Dr. Barnhart did state that she had reviewed the notes, she indicated that her expert opinions were her own and would have been the same had she relied solely on the autopsy photographs. Thus, we do not find that Dr. Barnhart served as a mere conduit for the content of Dr. Shaker's notes.

We find no Confrontation Clause violation occurred in this instance. Therefore, this issue is without merit.

*Id.* at 1212-14 (¶¶21, 26-27) (citation omitted). Likewise, in this case, there was "no Confrontation Clause violation" to the extent LeVaughn testified regarding his own opinions based on his own review of the autopsy photos.[4]

¶25. It is also important to emphasize that the autopsy photos themselves do not even implicate the Confrontation Clause. "[T]he [Confrontation] Clause bars only the introduction of *hearsay*—meaning, out-of-court *statements* offered to prove the truth of the matter asserted." *Smith*, 602 U.S. at 785 (emphasis added) (quotation marks omitted). "Simply put,

---

[4] The dissent argues that LeVaughn's testimony violated the Confrontation Clause because the State did not "establish that Arboe . . . was unavailable to testify." However, to the extent that LeVaughn offered his own independent opinions, there was no Confrontation Clause violation, and Arboe's availability or unavailability to testify is irrelevant.

a photograph does not meet the definition of a 'statement,' so it cannot qualify as hearsay under our rules of evidence." *Walters v. State*, 206 So. 3d 524, 535 (¶31) (Miss. 2016).[5] In short, photos are not statements, assertions, hearsay, or testimonial. Therefore, the admission of the autopsy photos in this case did not violate or even implicate the Confrontation Clause.

¶26. Because the bulk of LeVaughn's testimony was properly admitted and did not violate the Confrontation Clause, it is evident that the error in admitting the written autopsy report and allowing LeVaughn to repeat the report's conclusions was harmless. Because LeVaughn reached the same conclusions as the autopsy report based on his own independent review of the autopsy photos, the report and brief testimony admitted in error were merely cumulative, and the error was clearly harmless.[6]

**CONCLUSION**

¶27. Swims's convictions and sentences are **AFFIRMED**.

**BARNES, C.J., CARLTON, P.J., LAWRENCE, McCARTY, EMFINGER, WEDDLE AND LASSITTER ST. PÉ, JJ., CONCUR. WESTBROOKS, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**

---

[5] *Accord Smith v. State*, 398 So. 3d 875, 892-93 (¶36) (Miss. Ct. App. 2023), *aff'd*, 387 So. 3d 994 (Miss. 2024); *see also, e.g.*, *United States v. Clotaire*, 963 F.3d 1288, 1295 (11th Cir. 2020) (holding that the admission of photographs "pose no problem under the Confrontation Clause" because "[s]till frame pictures are not statements at all, let alone testimonial ones"); *Henriquez v. State*, 580 S.W.3d 421, 428 (Tex. App. 2019) ("[P]hotographs taken during autopsies are not considered statements. Thus, autopsy photographs are considered nontestimonial in nature and do not implicate the Confrontation Clause." (citation omitted)); *State v. Smith*, 367 P.3d 420, 433 (N.M. 2016) ("We hold that autopsy photographs [depicting a murder victim's wounds] do not constitute testimonial statements and therefore do not invoke the Sixth Amendment.").

[6] We also note that Swims never explains how LeVaughn's testimony prejudiced his defense. Swims admitted that he shot T three times, and he identifies nothing specific about LeVaughn's testimony that materially prejudiced his defense.

**McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE WRITTEN OPINION, JOINED BY WESTBROOKS, J.; McCARTY, J., JOINS IN PART.**

**McDONALD, J., CONCURRING IN PART AND DISSENTING IN PART:**

¶28. I concur with the majority's holding that Swims was not entitled to a *Weathersby* instruction and that the court did not err in allowing the testimony of the lead investigator, Captain Jarett Bundren. I further agree that Dr. David Arboe's signed autopsy report was testimonial hearsay and should not have been admitted into evidence, and I agree that any testimony Dr. LeVaughn gave relating to the autopsy violated the Confrontation Clause. However, I disagree with the majority that this is the only error with LeVaughn's testifying in this case and, according to the majority, that it was harmless error. In my opinion, the State's presentation of LeVaughn as its only witness to establish the cause and manner of death, an essential element of the alleged crime, violated other legal principles as well as the Confrontation Clause. Given the cumulative error and the totality of the circumstances surrounding LeVaughn's testimony, the admission of his testimony constitutes reversible error.

### *LeVaughn was not a fact witness.*

¶29. Before discussing LeVaughn as an expert, note that no one disputed that he was not a fact witness,[7] and he was not giving lay witness opinion testimony that is allowed under

---

[7] Rule 602 of the Mississippi Rules of Evidence states that a witness (other than an expert) may testify to a matter "only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." In this case, LeVaughn had nothing to do with the autopsy that Arboe performed or the autopsy photographs that Arboe took. So LeVaughn could not be called as a fact witness.

15

MRE 701.[8]  In this case, the findings of the autopsy and opinions concerning the cause and manner or death were clearly based on scientific knowledge within the scope of Mississippi Rule of Evidence 702, the opinions of expert witnesses.  So LeVaughn's testimony was not admissible as a fact witness.

### LeVaughn was not disclosed as an expert.

¶30.    However, the first error was that the State did not properly designate LeVaughn as an expert witness to give expert opinion testimony.  Rule 17.2(4) of the Mississippi Rules of Criminal Procedure requires that prior to trial, the prosecution disclose to the defendant "[a]ny reports, statements, or opinions of experts (written, recorded or otherwise preserved) made in connection with the particular case and the substance of any oral statement made by any such expert."  We have cited this rule along with the expectation that the State disclose all witnesses, including experts, and the substance of their testimony prior to trial.  *Moffite v. State*, 309 So. 3d 529, 538 (¶41) (Miss. Ct. App. 2019).

¶31.    In this case, the docket reflects that Swims moved for discovery—specifically, discovery that is required under Rule 17.2.  The State filed no response showing what the State provided.  However, during the trial, when the State called LeVaughn to testify, the

---

[8]  Mississippi Rule of Evidence 701 provides:

If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:

(a) rationally based on the witness's perception;
(b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
(c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

defense noted that LeVaughn's curriculum vitae was not produced during discovery. During a bench conference, the following exchange ensued:

(BENCH CONFERENCE)

BY THE COURT:   Was Mr. Levaughn disclosed as a witness and an expert witness?

BY MR. DRISKELL [(defense)]: I don't know if he was.

BY THE COURT: In discovery?

BY MR. DRISKELL: I have got post mortem examination that was performed by somebody else.

BY MR. JUBERA [(prosecution)]: Dr. Arboe conducted the autopsy. You and I discussed Levaughn coming up to testify before now that was probably months ago but.

BY MR. DRISKELL: I didn't between him and him I didn't know whose name was on it. I assumed we were talking about the person who did the examination.

BY THE COURT: You are certainly entitled to voir dire him on his qualifications.

BY MR. DRISKELL: I don't know if I doubt his qualification, this is, you know, I don't. If he is not the guy that performed the autopsy I am going to have to object. I understand what their role may be.

BY THE COURT: Yes. Okay. We will get that on the record. Mr. Driskell, your objection is noted and overruled.

According to this exchange, it is apparent that the State made no written disclosure of LeVaughn and his opinions and only orally discussed who was going to testify about the autopsy, who the defense assumed was the doctor who wrote the autopsy report.

¶32.   Although Swims did not raise this lack of pre-trial disclosure on appeal, in my

17

opinion, this discovery violation constitutes plain error. In considering applying the plain-error doctrine, we must determine "(1) whether the trial court deviated from a legal rule; (2) whether the error is plain, clear, or obvious; and (3) whether the error prejudiced the outcome of the trial. Only if the error resulted in a manifest miscarriage of justice will reversal occur." *Collins v. State*, 305 So. 3d 1262, 1267 (¶19) (Miss. Ct. App. 2020). Here, Rule 17.2 mandated disclosure of LeVaughn and his opinions. Moreover, it is obvious that the State did not make a clear disclosure of LeVaughn as an independent expert. Finally, the error in allowing LeVaughn to testify as the State's only witness to establish the cause and manner of death ultimately resulted in a Confrontation Clause violation as discussed below. To me, this constitutes manifest injustice. Accordingly, because the State failed to disclose LeVaughn and his opinions pre-trial, LeVaughn's testimony should have been excluded as a discovery violation.

### The Confrontation Clause was violated because Arboe was not shown to be unavailable.

¶33. The next error was the State's failure to establish that Arboe, who performed the autopsy, was unavailable to testify, which is one of the threshold requirements before calling a surrogate witness to testify. The Confrontation Clause of the Sixth Amendment guarantees the accused the right to confront the witnesses against him. *Davis v. Washington*, 547 U.S. 813, 821 (2006).[9] This right limits the State's ability to enter statements made by other individuals who do not testify in court as the United States Supreme Court held in *Crawford*

---

[9] Article 3, Section 26 of the Mississippi Constitution provides an almost identical safeguard. *Corbin v. State*, 74 So. 3d 333, 338 (¶13) (Miss. 2011).

*v. Washington*, 541 U.S. 36, 53-54, 59 (2004), stating:

> [T]he Sixth Amendment Confrontation Clause bars the admission of "testimonial statements" made by a witness who does not appear at trial, *unless the witness is unavailable and the defendant had a prior opportunity to cross-examine him.*

(Emphasis added). In *Crawford*, the testimonial statement in question was Crawford's wife's statement to law enforcement describing the stabbing incident in a manner that contradicted her husband's claim of self-defense. *Id*. at 39. The trial court admitted the statement finding the wife unavailable to testify due to the marital privilege, and the court found, for various reasons, that the statement was trustworthy. *Id*. at 40. The prosecution played the taped statement for the jury and relied upon it in closing. *Id.* at 40-41. Crawford was convicted and ultimately appealed to the United States Supreme Court. *Id.* at 41. After reviewing the history of the Confrontation Clause, *id.* at 43-52, the Court held that the Confrontation Clause protections

> applied to "witnesses" against the accused—in other words, those who "bear testimony." 2 N. Webster, An American Dictionary of the English Language (1828). "Testimony," in turn, is typically "[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact."

*Id*. at 51. The Court reversed Crawford's conviction, finding that the admission of the wife's testimonial statement alone was sufficient to make out a violation of the Sixth Amendment. *Id.*

¶34.   *Crawford* established the procedural requirements for the admission of an out-of-court statement by a witness to avoid a violation of the Confrontation Clause, namely (1) a showing that the witness who made the statement (or in this case, performed the autopsy and

prepared the report) is unavailable and (2) that the defendant had a prior opportunity to cross-examine the unavailable witness. An example of how a constitutional violation can be avoided if a witness is unavailable is found in *Ellis v. State*, 196 So. 3d 1029 (Miss. Ct. App. 2015). In that case, the forensic pathologist who performed the autopsy was going to be out of the country at the time of Ellis's trial. *Id*. at 1034 (¶12). Because the case had been previously continued, the trial court allowed the State to take the doctor's deposition and play the video at trial. *Id*. at (¶13). The court was present during the deposition, and Ellis had an opportunity to cross-examine the doctor. *Id*. The jury viewed the videotape of the deposition, which technically was an out-of-court statement by the doctor, but we found no error because Ellis had an opportunity to cross-examine the witness. *Id*. at 1035 (¶17). It should be noted that Ellis was able to confront the author of the autopsy and cross-examine him, even if it was not on the day of trial. *See also Stevenson v. State*, 357 So. 3d 1141, 1154 (¶43) (Miss. Ct. App. 2023) (holding that witness may testify remotely by two-way video if the trial court finds that such method is necessary and reliable).

¶35. Even when the Mississippi Supreme Court stretched the boundaries of the Confrontation Clause to allow another employee of the Mississippi Forensics Laboratory to testify instead of the actual tester, the Court did so because the actual tester was unavailable, and the testifying employee was involved in preparing the test report. *Jenkins v. State*, 102 So. 3d 1063, 1064 (¶1) (Miss. 2012). In both *Ellis* and *Jenkins*, the trial courts first established that the persons performing the autopsy or conducting the test were not available to testify before allowing alternative testimony. In the case at hand, the State never gave a

20

reason why Arboe could not testify. In my opinion, because the State did not establish Arboe's unavailability or attempt to use an alternative procedure to obtain that testimony, as in *Ellis* where Swims could have cross-examined him, we must find LeVaughn's testifying about the autopsy, manner, and cause of T's death violated the Confrontation Clause.[10]

### *The error in the admission of the autopsy report was not harmless*.

¶36.    Next, even the majority agrees that the admission of the autopsy report and allowing LeVaughn to testify from it further violated Swim's Sixth Amendment rights.  This error, however, in my opinion, was far from harmless.  The State specifically asked LeVaughn to describe the injuries T received "based on the autopsy report":

> Q.    So, Dr. LeVaughn, based on the autopsy report, can you describe to the jury the injuries that were received by Mrs. Swims?
>
> A.    The examination documented three gunshot wounds.  One to the chest, another to the right leg and another to the left leg.

In answering, LeVaughn directly referred to the report and described what Arboe had documented.  Then, the State showed LeVaughn Arboe's autopsy report and photographs, which the court admitted over Swims's objection.  LeVaughn was given Arboe's autopsy report to refer to and asked how an autopsy helps in determining the manner and cause of

---

[10] The majority disagrees and states that there was no need to show that Arboe was unavailable because there was no Confrontation Clause violation. *Ante* at n.4.  The majority reasons that because LeVaughn was giving independent opinions, Arboe's availability was irrelevant.  However, the majority puts the cart before the horse.  Here, the State used LeVaughn to authenticate and enter the autopsy report, which reflected Arboe's work and findings, not LeVaughn's.  LeVaughn merely conveyed these findings.  *Crawford* made it clear that  a witness cannot give such "testimonial hearsay" without first showing that the declarant was unavailable and that the defense had had a prior opportunity to cross-examine him.

death. On cross-examination, LeVaughn referred to measurements Arboe had made concerning the wounds that were documented in the report. LeVaughn ultimately gave opinions on T's cause and manner of death, which were identical to Arboe's opinions in the autopsy report. Therefore, the jury had not only LeVaughn's live testimony and autopsy photographs, the jury also had Arboe's written opinions and findings in the autopsy report to refer to in its deliberations to corroborate LeVaughn's "opinions." Therefore, the violation of the Confrontation Clause in the admission of the autopsy report was significant, prejudicial, and in my opinion, given the threshold violation of failing to show Arboe's unavailability to testify in the first place, reversible error.

### *The Confrontation Clause violation, in light of* Smith v. Arizona*, warrants reversal.*

¶37. Of deeper concern to me in analyzing this case is the United States Supreme Court's recent holding in *Smith v. Arizona*, 602 U.S. 779 (2024), which, in my opinion, requires us to find that calling LeVaughn as an expert to give an independent opinion as to the cause and manner of T's death, relying on Arboe's materials without any testimony from Arboe, also violates the Confrontation Clause.

### *A. Key Mississippi Confrontation Clause Holdings Prior to* Smith

¶38. I mentioned above that Mississippi has broadened the parameters of the Confrontation Clause and allowed hearsay testimony by surrogates, either under the theory of their involvement in the preparation or review of a report, or using Rule 703 experts to give independent opinions.

¶39. An example of the former is *Jenkins*, where the Mississippi Supreme Court allowed

22

surrogate testimony concerning forensic testing if the testifying witness was somewhat involved in preparing the test report. *Jenkins*, 102 So. 3d at 1064 (¶1). In that case, the arresting officer found several white rocks in Jenkins's possession that he sent to the Mississippi Crime Laboratory for analysis. *Id*. Jenkins was subsequently indicted for possession of cocaine. *Id*. At Jenkins's trial, the State called the director of the crime lab to testify to the test results of the drugs, instead of the laboratory analyst who actually did the testing because that analyst was on indefinite medical leave and unable to testify. *Id*. at (¶3). The director testified that although he did not participate in or observe the testing, he was a "case technical reviewer" and reviewed the data and report to ensure that the data supports the conclusions. *Id*. at 1064-65 (¶4). He further testified that based on the data, he reached his own conclusion that the substance was cocaine, and he signed the report as the case reviewer. *Id.* at 1065 (¶4). After his conviction, Jenkins appealed, and we found his Confrontation Clause issue was procedurally barred. *Id.* at 1066 (¶8). The Mississippi Supreme Court disagreed, finding the claim was not barred and considering the merits of Jenkins's Constitutional claim. *Id*. at 1066-67 (¶8).

¶40.    The *Jenkins* Court noted that "[f]orensic laboratory reports created specifically to serve as evidence against the accused at trial are among the 'core class of testimonial statements' governed by the Confrontation Clause." *Id.* at 1066 (¶9) (citing *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310 (2009)). The Court further noted the cases that had prohibited the admissions of reports without the testimony of the person actually doing the testing but then stated:

23

None of these cases stand for the proposition that, in every case, the only person permitted to testify is the primary analyst who performed the test and prepared the report. This Court has said that there are instances in which someone other than the primary analyst who conducted the test can testify regarding the results.

*Id*. at 1067 (¶13) (quotation marks and citations omitted). Citing *McGowen v. State*, 859 So. 2d 320, 329 (¶68) (Miss. 2003), the Court noted the two-part test it had created to determine if a witness satisfies the defendant's right to confrontation:

First, we ask whether the witness has "intimate knowledge" of the particular report, even if the witness was not the primary analyst or did not perform the analysis firsthand. Second, we ask whether the witness was "actively involved in the production" of the report at issue. We require a witness to be knowledgeable about both the underlying analysis and the report itself to satisfy the protections of the Confrontation Clause.

*Jenkins*, 102 So. 3d at 1067 (¶13) (citation omitted). The Court held that "[a] supervisor, reviewer, or other analyst involved may testify in place of the primary analyst where that person was 'actively involved in the production of the report and had intimate knowledge of the analyses even though [he or] she did not perform the tests first hand.'" *Id*. at 1069 (¶19) (quoting *McGowan*, 859 So. 2d at 340 (¶68)).[11]

¶41. As an alternative to calling co-workers or supervisors who helped create a report, the

---

[11] More recently, in *Smith v. State*, 398 So. 3d 875, 894 (¶41) (Miss. Ct. App. 2023), we reiterated that a supervisor who actively participated in creating an autopsy report, could testify to its contents, stating:

The record shows that Dr. LeVaughn actively participated in the autopsy report because (1) in his role as Dr. Funte's supervisor, he actively reviewed her work, and (2) he conducted an independent review of the autopsy report. Moreover, this Court has held that "[w]hen the testifying witness is a court-accepted expert in the relevant field who participated in the analysis in some capacity . . . then the testifying witness's testimony does not violate [the Confrontation Clause]."

Mississippi Supreme Court has found no Confrontation Clause violation when the testifying surrogate is a Rule 703 disclosed expert who simply reviewed the underlying forensic report and gave an "independent expert opinion" on the manner and cause of death, relying mainly on autopsy photographs. *Christian v. State*, 207 So. 3d 1207, 1212-13 (¶21) (Miss. 2016). In that case, which the majority cites, the State tendered Dr. Erin Barnhardt of the State Medical Examiner's Office to testify about the victims' autopsies that had been performed by Dr. Adel Shaker. *Id*. Although Barnhardt had not performed the autopsies, she testified that she had reviewed the report, photographs, and case notes. *Id*. In the appeal of Christian's conviction, the Mississippi Supreme Court found no Confrontation Clause violation, noting that although Barnhardt reviewed autopsy notes, "she indicated that her expert opinions were her own and would have been the same had she relied solely on the autopsy photographs." *Id*. at 1213 (¶26). Thus, the Court found that Barnhardt did not serve as a mere conduit for the content of Dr. Shaker's notes. *Id*.

¶42. Relying on *Christian*, the Supreme Court held that when an expert pathologist gives his own expert opinion on the cause of death, and does not just testify about another doctor's report, there is no Confrontation Clause violation. *Clark v. State*, 343 So. 3d 943, 996 (¶254) (Miss. 2022). In that case, the pathologist (again, Dr. Erin Barnhardt) who had performed the autopsy was no longer employed by the State Medical Examiner's Office. *Id*. at 995 (¶247). Dr. Brently Davis testified instead, "indicating that he reviewed the case, the information, and agreed with her [Barnhardt's] cause and manner of death." *Id*. Davis testified that he was prepared to testify to his own opinions based on his review of the

25

materials "irregardless [sic] of what conclusions Dr. Barnhardt reached." *Id.* at 996 (¶248). On appeal, we concluded that Davis had given his own expert opinion, and thus, there was no Confrontation Clause violation. *Id.* at 997 (¶254).

B.     *Impact of* Smith v. Arizona *on Mississippi Precedents*

¶43.     In my opinion, *Smith v. Arizona* calls all these Confrontation Clause cases into question and requires a bold holding in the Swims case before us. In *Smith*, Arizona law enforcement sent a large quantity of what appeared to be drugs that they found in a shed on Smith's property to the State crime lab for analysis. *Smith*, 602 U.S. at 789. The analyst, Elizabeth Rast, performed the requested tests and prepared a set of notes and a signed report. *Id.* at 790. The report detailed each of the eight items submitted, the properties of these items (e.g., the weight and measurements), the tests performed, and Rast's conclusions. *Id.* The report also contained two pages of ultimate findings in which she identified the substances as methamphetamine, marijuana, and cannabis. *Id.*

¶44.     Three weeks before trial, the State replaced Rast as a witness with a different analyst employed at the lab, Greggory Longoni, to testify to the test results because Rast "had stopped working at the lab for unexplained reasons." *Id.* Longoni had no prior connection to the case, but the State said he would "provide an independent opinion on the drug testing performed" by Rast. *Id.* When he testified, Longoni referred to Rast's report, relating the contents item by item. *Id.* at 791. Longoni described the methods used to examine the specimens and stated that the testing in this case had adhered to general principles of chemistry and lab protocols. *Id.* He then offered an "independent opinion" that agreed with

26

the conclusions found in Rast's report. *Id*. Smith was convicted, and on appeal, the Arizona Court of Appeals held that there was no Confrontation Clause violation because the expert could "constitutionally present his independent expert opinions as based on his review of Rast's work." *Id*. at 792.

¶45.   The United States Supreme Court disagreed. *Id*. In its rationale, the Court noted that "Smith's confrontation claim c[ould] succeed only if Rast's statements came into evidence for their truth." *Id*. at 792.   The Court instructed that when considering a confrontation claim, the court must identify the role of a given out-of-court statement and "whether the absent analyst's statements were introduced for their truth." *Id*. The State argued that Rast's statements in her report were not brought in for their truth, but "to show the basis" for the independent expert's opinion. *Id*. The Court rejected this argument and stated that despite what the rules of evidence may allow, courts "conduct an independent analysis of whether an out-of-court statement was admitted for its truth." *Id*. at 794.  The Court stated:

> If an expert for the prosecution conveys an out-of-court statement in support of his opinion, and the statement supports that opinion only if true, then the statement has been offered for the truth of what it asserts. How could it be otherwise?

*Id*. at 795.  The Court noted the impermissible consequences if hearsay were allowed to be admitted simply because it formed the basis of an expert's opinion argument, stating:

> So every testimonial lab report could come into evidence through any trained surrogate, however remote from the case.  And no defendant would have a right to cross-examine the testing analyst about what she did and how she did it and whether her results should be trusted.  In short, Arizona wants to end run all we have held the Confrontation Clause to require.  It cannot.

*Id*. at 799.  In addition, the Court viewed the expert's testimony from a jury's perspective,

27

noting:

> The jury cannot decide whether the expert's opinion is credible without evaluating the truth of the factual assertions on which it is based. If believed true, that basis evidence will lead the jury to credit the opinion; if believed false, it will do the opposite.

*Id*. at 796 (citation omitted). Because the jury could consider Longoni's opinions as true only if they accepted Rast's statements concerning her lab work as true, the Court concluded that Rast's statements came in for their truth. *Id*. at 798.

¶46. The *Smith* Court then noted that besides determining whether the statements were hearsay (brought in for the truth of the matter contained), courts must also determine whether the out-of-court statements were "testimonial." *Id*. at 799.

> As earlier explained, that question is independent of everything said above: To implicate the Confrontation Clause, a statement must be hearsay ("for the truth") and it must be testimonial—and those two issues are separate from each other.

*Id*. at 800. "Courts must identify the statements introduced and determine, given all the relevant circumstances, the principal reason they were made." *Id*. The Court vacated the Arizona Court of Appeals' judgment and remanded for the state court to determine whether Rast's records were testimonial. *Id*. at 803.

¶47. In the case at hand, even the majority agrees that Arboe's autopsy report was testimonial hearsay and that its admission and use by LeVaughn violated the Confrontation Clause. *Smith* specifically rejects the surrogate testimony of experts like LeVaughn, who have no prior connection with a case but offer an "independent expert opinion" using testimonial hearsay. Here, LeVaughn had no involvement in the preparation or review of the

28

autopsy. In essence, the opinion LeVaughn offered was the opinion Arboe formed as a result of the autopsy that he had performed. LeVaughn made no additional analysis, and the State used LeVaughn to relay what Arboe found; to use the *Smith* Court's word, LeVaughn effectively became Arboe's mouthpiece. *See id.* at 800. Under the Sixth Amendment, Swims had the right to confront the person who authored the autopsy report, Arboe. In my opinion, *Smith v. Arizona* requires us to withdraw our approval of the sole use of surrogate testimony by an expert who reviews autopsy reports and similar materials and then claims to give an independent opinion on the manner and cause of death.[12] We can no longer ignore the violations of the Confrontation Clause such testimony presents.

**Conclusion**

¶48. In summary, it is my opinion that the cumulative errors regarding LeVaughn's testimony in this case warrant reversal. LeVaughn was the only witness to testify as to the manner and cause of T's death, an essential element the State needed to prove beyond a reasonable doubt to convict Swims. Without that proof, the conviction cannot stand.

**WESTBROOKS, J., JOINS THIS OPINION. McCARTY, J., JOINS THIS OPINION IN PART.**

---

[12] I am not advocating that a properly disclosed expert could not testify either in support or opposition to the findings of an autopsy. However, the Confrontation Clause still requires that the defendant be able to confront and cross-examine the preparer of that autopsy report.